**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

                Plaintiff,

v.

ALL RIGHT, TITLE AND INTEREST, ETC.
(8 BAYVIEW TERRACE), ET AL.

                Defendants.

Civ. No. 00-1454 (DRD)

**O P I N I O N**

*Appearances by:*

RALPH J. MARRA, JR.
Acting United States Attorney
by: Peter G. O'Malley, Esq.
Assistant U.S. Attorney
970 Broad Street, Suite 700
Newark, NJ 07102

      *Attorney for Plaintiff*

MCDONALD & ROGERS, LLC
by: Michael J. Rogers, Esq.
181 West High Street
Somerville, NJ 08876

      *Attorneys for Defendant*

SULLIVAN & CROMWELL, LLP
by: Tracy Richelle High, Esq.
125 Broad Street
New York, NY 10004

      *Attorneys for Interested Party Union Bank of Switzerland, AG*

**DEBEVOISE, Senior District Judge**

This matter arises out of a civil forfeiture proceeding instituted on March 28, 2000 by Plaintiff, the United States of America ("United States" or "the Government"), against certain real and personal property belonging to Imre Papp ("Imre") and his wife, Maria ("the Papps"), including a residential dwelling located at 8 Bayview Terrace in Greenbrook, New Jersey ("the house" or "the residence") and the contents of three bank accounts held in New Jersey.[1]  The alleged illegal activity on which the forfeiture is premised involved a scheme in which Imre and his late brother, Endre, forged medium-term fixed-rate notes in the name of Seeland Bank – which has since been purchased by the Union Bank of Switzerland, AG ("UBS") – and proceeded to cash the notes and their attached coupons for over 20 million Swiss francs.

The Government now moves to reopen the case, which was stayed pending the outcome of Imre's criminal prosecution by Swiss authorities, and requests that the Court enter summary judgment pursuant to Federal Rule of Civil Procedure 56 rejecting the Papps' claims to the defendant property.  That request is premised on the Government's contention that Mr. Papp's conviction by a Swiss tribunal on charges of money laundering is prima facie evidence that the property at issue in this case constitutes the proceeds of illegal activity, and is therefore subject

---

[1] The bank accounts at issue are: (1) account number 6905-8830 held at the branch office of Charles Schwab and Company, Inc., located at 1170 Route 22 East, Bridgewater, New Jersey, ("Charles Schwab account"); (2) account number 0560328351 held by Unitrade Unlimited at the branch office of Independence Community Bank located at 905 Broad Street, Newark, New Jersey ("Independence Community Bank account"), and (3) account number 0002721465 held at the branch office of Summit Bank located at 630 Franklin Boulevard, Somerset, New Jersey ("Summit Bank account").

to seizure under 18 U.S.C. § 981.[2]   The Papps counter by (1) citing several purportedly legitimate sources of income that they contend raise a genuine issue of fact as to whether the defendant property was derived from illegal activity, and (2) arguing that Maria Papp's share of the property should not be forfeited because she has not been accused of any criminal wrongdoing and is an "innocent owner" within the meaning of 18 U.S.C. § 983(d).  Upon review of the decision by the Swiss court and the evidence of purportedly legitimate income submitted by the Papps, the Court finds that the Papps have failed to meet their burden of demonstrating by a preponderance of the evidence that the Defendant property is not subject to forfeiture. Therefore, the Government's Motion for Summary Judgment as to all property other than the Summit Bank account, and that property will be forfeited.

## I.  BACKGROUND

This action arises out of a bold scheme in which Imre Papp and his brother Endre defrauded Swiss banks of almost $13 million.  During the late 1990s, Endre was employed as a controller of medium-term fixed rate notes at Seeland Bank.  In connection with his work there, he routinely came in contact with the unique forms used by the bank to print such notes.  At some point, Endre began stealing those forms and, with the help of his brother Imre, forging medium-term securities in the name of Seeland Bank.  In a spree that lasted until their arrests in 1998 and 1999, the brothers issued themselves notes worth over 800 million Swiss francs.  Imre then converted approximately 20 million to cash by redeeming the notes and their attached

---

[2] The Government instituted this action on March 28, 2000.  The statute providing for the civil forfeiture of property derived from illegal activity, 18 U.S.C. § 981, was modified effective August 23rd of that year by the Civil Asset Forfeiture Reform Act ("CAFRA"), Pub L. 106-185. The Court of Appeals for the Third Circuit has held that the CAFRA does not apply retroactively to matters in which the Government filed its Complaint prior to August 23, 2000.  United States v. One "Piper" Aztec, 321 F.3d 355, 359 (3d Cir. 2003).  Therefore, the Court must apply the version of 18 U.S.C. § 981 that was in effect on the date this case commenced.  All citations to 18 U.S.C. § 981 contained in this ruling refer to the version of the statute effective as of March 28, 2000.

coupons[3] at Seeland and various other banks.  In order to conceal his illegal activities, Imre obtained a fraudulent United States passport under the name "James Galambos."  He also created several companies in Switzerland that were used as a means of channeling the money obtained from the scheme through various different accounts in order to make it more difficult to trace.

## A.  Activities in the United States

At the same time that he and his brother were perpetrating the above-mentioned fraud, Imre apparently decided to start a life for himself and his family in the United States.  The Government has presented evidence that a large portion of the proceeds of Imre and Endre Papp's scheme to defraud Swiss banks eventually made its way to the accounts held jointly by Imre and Maria Papp in the United States, and that some of those proceeds were used to finance Imre Papp's purchase of land at 8 Bayview Terrance in Greenbrook, New Jersey, and the construction of a residence on that lot.  Between November 26, 1994 and May 24, 1998, Imre travelled to the United States on at least eight occasions.  During that time, he brought with him $305,300 in cash, $100,000 of which was seized by United States Customs officials on May 24, 1998 due to the fact that it had not been properly declared.  Later that day, Swiss authorities intercepted a phone call between Imre and his brother Endre, in which Imre confirmed that the $100,000 had been seized.

In total, Endre transferred over $1.1 million to accounts held by Imre in the United States between January 1996 and October 1998.  Some of the money was funneled through companies that the brothers controlled, such as the roughly $345,000 that was deposited in the Papp's Summit Bank account by a property management company in Lichtenstein.  Other transfers were made in Endre's name, such as a deposit to the same account in the amount of $29,975 on

---

[3] The coupons representing the yearly interest payments the holder of the note was entitled to collect from Seeland Bank, and could apparently be redeemed separately from the note itself.

December 17, 1997.  In addition to those outlined above, Imre Papp's banking records reveal that he received the following transfers from sources in Europe to accounts in the United States during the period he and his brother were engaged in the scheme:

(1)   $49,985 sent by Imre to the Papps' Summit Bank account on September 23, 1996;

(2)   $408,970 sent through a wire service known as Bankers NYC to the Papps' Independence Community Bank account on September 27, 1996;

(3)   $69,985 sent by a shell company known as "Die Wache" through a Credit Suisse bank account and then deposited in the Papps' Summit Bank account on October 28, 1997;

(4)   $1,700 sent from a bank Budapest, Hungary to the Papps' Summit Bank account on November 3, 1997;

(5)   $24,985 sent by a shell company known as "Redmont Company Limited" through a Credit Suisse bank account and then deposited in the Papps' Summit Bank account on December 10, 1997;

(6)   $49,975 sent by a shall company known as "Hobson Finance Limited" through a Credit Suisse bank account and then deposited in the Papps' Summit Bank account on February 17, 1998;

(7)   $29,975 sent by Endre through a Credit Ansalt bank account and then deposited in the Papps' Summit Bank account on February 20, 1998;

(8)   $39,917.87 sent by Endre through an account with the Hungarian Foreign Trade Bank Limited in Budapest and then deposited in the Papps' Summit Bank account on April 1, 1998;

(9)   $30,000 sent through an unknown Hungarian account and deposited in the Papps' Summit Bank account on April 30, 1998;

(10)   $149,985 sent from Hobson Finance Limited through an account in Lichtenstein and deposited in the Papps' Summit Bank account on May 29, 1998;

(11)   $12,485 sent by Endre through an account with the Hungarian Foreign Trade Bank Limited in Budapest and deposited in the Papps' Summit Bank account on September 15, 1998.

(12)  $150,000 sent by Endre to the Papps' Summit Bank account on May 27, 1998.

There is strong evidence that the Papps' residence at 8 Bayview Terrance in Greenbrook, New Jersey was obtained using funds received in the transfers outlined above.  On December 5, 1996, shortly after he began traveling to the United States with large amounts of currency, Imre Papp purchased a parcel of land on which the house sits for the sum of $175,000.  During the telephone conversation intercepted by Swiss authorities on May 24, 1998 in which he informed Endre that $100,000 of the currency he had attempted to carry into the United States earlier that day had been seized by Customs officials, Imre stated that, "[I]n order to be able to finish the house, I need another 150 thousand."  Endre did not disappoint.  Three days later, $150,000 was wire transferred from Lichtenstein to the Papps' Summit Bank account.

Over the two years after he purchased the lot at 8 Bayview Terrace, Imre oversaw the construction of a residence on the property.  He paid some of the expenses associated with the construction using personal checks, many of which were issued shortly after similar sums of money were transferred from sources in Europe to accounts held jointly by the Papps in the United States.  For example, Imre wrote checks on the Defendant accounts at Independence Community and Summit Bank – the two accounts into which the transfers outlined above were made – to home goods suppliers such as Home Depot for approximately $114,625; Hunterdon Building Supply for $32,936.30; J&M Flooring for $11,269.10; Richmond Ceramic Tile for $6,972.94; Worldwide Wholesale Floor Covering for $13,381.12; and a company called "Poolside" for $12,311.  Additionally, Imre issued a check to Carl H. Stover, an architect, in the amount of $6,618.56 for his services in helping design the house.

On March 13, 1999, the Papps obtained a $400,000 mortgage on the house, $321,141.97 of which was paid to them in cash, while the rest was used to pay the balance owed for the lot at

8 Bayview Terrace and other miscellaneous expenses.  Between February and April of 1999, the Papps used $157,500 from the Summit Bank account to open and fund a Charles Schwab account.  Those accounts, along with the one at Independence Community Bank and the residence and lot at 8 Bayview Terrace, make up the defendant property at issue in this litigation.

## B.  Arrests, Extradition, and Forfeiture Proceedings

Seeland Bank officials apparently became aware of Endre and Imre Papp's activities in December 1997.  After an investigation by Swiss authorities, Endre was arrested in that country in October 1998.  A warrant for the arrest of Imre, who was living in the United States at the Defendant property, was issued by a Swiss court on August 20, 1999.  At the request of Swiss authorities and on application by the Federal Bureau of Investigation, this Court issued an arrest warrant for Imre on August 24, 1999.  The next day, agents of the United States Marshals Service and Federal Bureau of Investigation arrested Mr. Papp at his home.  After Imre's arrest, this Court commenced extradition proceedings and, on January 20, 2000, ordered that he be delivered to Swiss authorities and transferred to that country to stand trial.

While Imre and Endre Papp were awaiting trial in Switzerland, the Government – at the request of Swiss authorities – commenced civil forfeiture proceedings against the Defendant property.  In a Complaint filed on March 28, 2000, the Government outlined the fraudulent scheme discussed above and argued that the Papps' residence and bank accounts were the proceeds of illegal activity and therefore subject to forfeiture pursuant to 18 U.S.C. § 981.[4]  Imre and Maria Papp filed an Answer in which they asserted claims to the property on May 18, 2000.  On March 8, 2002, the Court entered a Consent Order staying the forfeiture action pending the outcome of the Swiss criminal proceedings against Endre and Imre.

---

[4] The Defendant accounts were frozen on March 27, 2000, the day before the Government filed its Complaint.  They have remained inaccessible to the Papps for the duration of this litigation.

**C. Swiss Judgment**

On March 16, 2001, Imre and Endre were convicted by a Swiss trial court of several offenses, including forging identification documents, professional fraud, and professional money laundering.  A series of appeals followed until, on October 15, 2008, the Court of Cassation of the Superior Court of the Canton of Berne ("Court of Cassation") entered a final judgment affirming the convictions of both Imre and Endre.  In its ruling, the Court of Cassation specifically affirmed several factual findings made by the lower courts that are relevant to the present civil forfeiture proceeding.[5]

With respect to the crimes underlying this proceeding, the Court of Cassation found that "Imre Papp converted into cash a total of 20 forged public medium term bonds of Seeland Bank alone, as well as through four companies established by him by submitting these forged securities at various banks and causing them to be sold or pledged."  (Pl.'s Br. Supp. Mot. Summ. J., Ex. 1 at 58.)  As a result of those activities, "several hundred thousand USD of the proceeds of the proceeds from the forged public medium term bonds and coupons flowed into his private account[s]."  (Id. at 59.)

Elsewhere in its decision, the Court of Cassation explicitly addressed Imre's transfer of illegally-obtained funds to the Defendant bank accounts in United States.  In doing so, it restated the accusation of Swiss prosecutors that:

> Imre Papp imported from August 1994 to August 24, 1999 portions of the proceeds mentioned as cash to the United States, caused them to be transferred to accounts in the United States via Hungary and Lichtenstein, or had portions of them brought to him … which as per October 1998 amounted to the equivalent of at least USD 1.25 million.

---

[5] The original ruling by the Court of Cassation was issued in German.  The Government has provided this Court with a certified English translation of that ruling, and the Papps have not disputed the accuracy of that translation.  Therefore, the Court accepts for the purposes of today's decision the authenticity of that translation.

(Id. at 66.)

After examining the evidence, the Court of Cassation agreed with the prosecution.  The Court addressed separately circumstances in which (1) Endre transferred money to Imre's accounts in the United States, and (2) occasions on which Imre transferred the proceeds of the scheme to his own accounts or physically imported funds to the United States.  With respect to the former, the Court of Cassation found that "Endre Papp himself transferred monies multiple times to his brother, … and/or handed his brother USD 100,000 in one case."  (Id. at 68.)  Turning to Imre's transfers to his own accounts and importation of currency to the United States, the Court of Cassation found that:

> Imre Papp himself imported cash in the amount of approximately USD 300,000 to the United States from Switzerland, which he had obtained from the forged securities and coupons brought into circulation.  In addition, he transferred to himself approximately USD 140,000 to the United States from Hungary.

(Id.)

Based on those findings, the Court of Cassation ultimately upheld Imre's money laundering conviction, stating that, "In total … the defendant himself [Imre], as well as with his sons, brought money in the amount of multiple millions from Switzerland to Hungary, Lichtenstein, Luxembourg and the United States and invested it there."  (Id.)

With respect to the Defendant property at 8 Bayview Terrace in Greenbrook, New Jersey, however, the Court of Cassation affirmed the lower court's refusal to rule that the house was built using the proceeds of illegal activity.  That refusal was not based on a finding that the Papps built the home using untainted funds, but rather on the fact that "various documents requested in the United States through letters rogatory arrived at the court only after conclusion of the hearing of evidence," thus meaning that Imre and his attorneys never had the chance to challenge the evidence showing that the house was built using the proceeds of money laundering and fraud.

(Id. at 68-69.)  The decision by the Court of Cassation not to rule explicitly that the residence at 8 Bayview Terrace was built with stolen funds did not affect its broader holding that Imre had invested the proceeds of his money laundering in the United States.  To the contrary, the Court of Cassation ultimately found not only that those funds were invested in the United States, but more specifically in the state of New Jersey, holding that "Imre Papp is … found guilty of professional money laundering, in confirmation of the lower court judgment, committed from September 1994 to August 24, 1999 in New Jersey and elsewhere in the amount of multiple millions."  (Id. at 87.)

## II.  DISCUSSION

Based on the evidence outlined above that Imre Papp received transfers of stolen funds and imported large amounts of currency to the United States – including with the findings of the Swiss Court of Cassation to that effect – the Government argues in its pending Motion for Summary Judgment that there is probable cause to believe that the Defendant property represents the proceeds of money laundering by Imre, and is therefore subject to forfeiture under 18 U.S.C. § 981.  The Papps counter by arguing that the money used to purchase the lot at 8 Bayview Terrace, build their residence, and fund the Defendant accounts may have been derived from legitimate sources.  In the alternative, they argue that Maria Papp – who holds a tenancy in the entirety in the residence – is an innocent owner under 18 U.S.C. § 983(d), and her interest in the house therefore should not be forfeited.

With respect to their contention that they funded the purchase of the lot at 8 Bayview Terrace and the subsequent construction of their residence using legitimate income, the Papps rely primarily on Imre Papp's testimony that he received a loan of $409,000 in September 1996 from Jozsef Selmeczi.  Additionally, the Papps note several other sources of purportedly

legitimate income, including (1) a 1998 loan from Peter Tartsanyi to Imre in the amount of $150,000, (2) $165,000 derived from the sale of their previous home in 1999, (3) a $400,000 mortgage on the property at 8 Bayview Terrace obtained in March 1999, (4) an unspecified amount of income derived business ventures, including an import/export company that Imre alleges he operated as a partnership with his brother Endre, and (5) salary payments earned by Maria Papp pursuant to her employment during the time period in question.  In order to determine whether the Government is entitled to summary judgment holding that the Defendant property is subject to forfeiture, the Court must weigh the evidence that the property was obtained using the proceeds of illegal activity against the Papps' claims to the contrary using burden of proof applicable to the version of 18 U.S.C. § 981 in force at the time the action was filed.

## A.  Standard of Review

Summary judgment is proper where "there is no genuine issue as to any material fact and … the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law."  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

The party moving for summary judgment has the burden of showing that no genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case.

Id. at 325.  If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine fact issue exists and a trial is necessary.  Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a material dispute, not simply create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The Court's function, however, is not to weigh the evidence and rule on the truth of the matter, but rather to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  If there are no issues that require a trial, then judgment as a matter of law is appropriate.  Id. at 251-52.

**B.  Civil Forfeiture Burden of Proof**[6]

Civil forfeiture proceedings pursuant to 18 U.S.C. § 981 are subject to a burden shifting framework.  Under that scheme, the Government bears the initial burden of demonstrating that there is probable cause to believe the defendant property is subject to forfeiture.  United States v. $734,578.82 in U.S. Currency, 286 F.3d 641, 649 (3d Cir. 2002).  "Probable cause is defined as reasonable ground for the belief of guilt supported by less than prima facie proof but more than mere suspicion."  Id. (quoting United States v. On Leong Chinese Merchants' Ass'n Bldg., 918 F.2d 1289, 1292 (7th Cir. 1990)).  Thus, the Government satisfies its initial burden if it produces evidence "adequate and sufficiently reliable to warrant the belief by a reasonable person that the property" constitutes the proceeds of illegal activity.  United States v. RR No. 1 Box 224, 14

---

[6] As discussed supra at n. 2, this case is governed by the pre-CAFRA version of 18 U.S.C. § 981. The discussion of burden of proof contained in today's ruling applies to that version of the statute, and does not take into account any modifications to the burden of proof made by the CAFRA.

F.3d 864, 869 (3d Cir. 1994) (internal quotation omitted).  In doing so, the Government may rely on hearsay.  United States v. 6109 Grubb Rd., 886 F.2d 618, 621 (3d. Cir. 1989).

"Once the government demonstrates probable cause, the ultimate burden shifts to the claimant to prove by a preponderance of the evidence that the property is not subject to forfeiture."  Id. (quoting On Leong, 918 F.2d at 1292); see also 19 U.S.C. § 1615 (describing burden shifting framework in civil forfeiture proceedings).  If the Government establishes probable cause to believe the defendant property is subject to forfeiture and the claimant fails to meet his or her burden of rebutting that belief by a preponderance of the evidence, summary judgment ordering forfeiture is appropriate.  On Leong, 886 F.2d at 1292.

**C.  The Government's Evidence**

The evidence submitted by the Government is more than sufficient to establish probable cause to believe that the Defendant property constitutes the proceeds of Imre Papp's illegal activities.  As discussed above, the Government produced evidence that Imre personally imported $305,300 in stolen currency – $100,000 of which was seized by Customs officials – to the United States between November 26, 1994 and May 24, 1998.  Moreover, the Government has produced wire transfer records showing that Endre transferred over $1.1 million to accounts held by Imre in the United States between January 1996 and October 1998.  Included in that sum was a May 27, 1998 transfer of $150,000, which was made shortly after a telephone call in which Swiss authorities recorded Imre telling Endre that Customs officials had seized $100,000 of undeclared currency when he arrived in the United States three days earlier, and stating that "[I]n order to be able to finish the house, I need another 150 thousand."

The evidence outlined by the Government in its Complaint was verified by the Swiss Court of Cassation in its decision affirming the conviction of Imre and Endre on money

laundering charges.  In that ruling, the Court of Cassation explicitly agreed with the
Government's assertion that Imre personally imported $305,300 in illegally-obtained currency to
the United States, stating that "Imre Papp himself imported cash in the amount of approximately
USD 300,000 to the United States from Switzerland, which he had obtained from the forged
securities and coupons brought into circulation."  (Pl.'s Br. Supp. Mot. Summ. J., Ex. 1 at 68.)
The Court of Cassation also verified the Government's allegations that Endre transferred large
sums of laundered money to accounts held by Imre in the United States, stating that "Endre Papp
himself transferred monies multiple times to his brother, … and/or handed his brother USD
100,000 in one case."  (Id. at 68.)  Based on those findings, the Court of Cassation held that Imre
had engaged in money laundering "from September 1994 to August 24, 1999 in New Jersey and
elsewhere in the amount of multiple millions."  (Id. at 87.)

      The records of the Papps' spending during the period in question, from September 1994
to August 24, 1999, weigh especially heavily in favor of finding that the Defendant property
constitutes the proceeds of illegal activity.  During that period, they wrote checks totaling
$373,114.02 in connection with the construction of a residence at 8 Bayview Terrace in
Greenbrook, New Jersey: (1) $175,000 to purchase the lot, (2) $179,184.46 at various home
supply stores, (3) $12,311 to a company called "Poolside," and (4) $6,618.56 to an architect for
his services in helping design the house.  Each of those checks was written shortly after Imre
received a wire transfer from sources in Europe.  Additionally, the expenses outlined above,
while substantial, do not fully account for the cost of labor and other materials (such as lumber)
involved in building the house, both of which would have significantly increased the total

amount spent by the Papps during the period of its construction from early 1997 to December, 1998.[7]

Similarly, bank records from the three Defendant accounts support the Government's contention that they are the proceeds of illegal activity.  As discussed above, approximately $833,968 was transferred from foreign sources – either by Endre himself or one of the various shell companies used as part the brothers' scheme – to the Papps' Summit Bank account between January 1996 and October 1998.  An additional $408,970 was transferred to the Papps' Independence Community Bank account.  The Charles Schwab account, which is the third Defendant account in this action, was funded using checks from the Summit Bank account, including payments of (1) $2,500 on February 24, 1999, (2) $75,000 on March 11, 1999, and (3) $80,000 on April 5, 1999.

Moreover, the Papps on March 3, 1999 entered into a $400,000 mortgage on their residence.  Of that, $321,141.97 was paid as a lump sum and deposited in the Summit Bank account (the remainder was used to pay off the purchase of the lot on which the residence was built).  As aforementioned, there is probable cause to believe that the residence and the land on which it was constructed were obtained using the proceeds of Imre's money laundering.  Therefore, any money received pursuant to a mortgage on that property would be subject to forfeiture, and the $321,141.97 payment deposited in the Papps' Summit Bank account lends further support to the Government's contention that the contents of that account were derived from illegal activity.

---

[7] Imre Papp contends that he personally completed the majority of the work involved in constructing the house, a fact that is verified by the testimony of his neighbors.  (Compl. ¶ 12.) While his personal involvement may have decreased the labor expenses associated with the project, it does not account for the cost of materials or the high probability that at least some other labor was used.

**D.  The Papps' Claims of Legitimate Funding**

As discussed above, the Papps attempt to rebut the Government's evidence that the Defendant property constitutes the proceeds of illegal activity by pointing to various sources of purportedly legitimate income that they claim were used to obtain the residence and fund the Defendant accounts.  One of those sources, which relates to the Summit Bank account, appears to have been lawfully obtained.  In all, though, the purportedly-legal income claimed by the Papps is unsupported by the evidence and far too small to account for the total cost of the residence at 8 Bayview Terrace or the majority of the funds held in the three Defendant accounts. Therefore, the Court finds that the Papps have failed to carry their burden of showing by a preponderance of the evidence that the Defendant property – other than the Summit Bank account – was not obtained using the proceeds of illegal activity, see 6109 Grubb Rd., 886 F.2d at 621, and summary judgment ordering forfeiture of that property will be granted.  See On Leong, 886 F.2d at 1292.

**i.    *Selmeczi Loan***

The most significant source of purportedly legitimate funding claimed by the Papps is a loan of $409,000 that Imre contends he received on September 25, 1996 from an acquaintance, Dr. Jozsef Selmeczi.[8]  (Imre Papp Aff. ¶ 4.)  As documentation of the loan in question, the Papps submitted an affidavit from Dr. Selmeczi dated November 8, 2008.  In his Affidavit, Mr. Selmeczi stated that:

---

[8] In his Affidvait, Imre Papp spells Mr. Selmeczi's first name "Josef."  Mr. Selmeczi's Affidavit, however, gives a spelling of "Jozsef."  That variation is presumably attributable to one of two explanations: either (1) Imre Papp does not know how to spell the name of the man who loaned him $409,000 to purchase his home, or (2) the typist who prepared the affidavits committed an error.  In keeping with its duty in deciding the pending Motion for Summary Judgment to make all reasonable factual inferences in light of the non-moving party, see Babbitt, 63 F.3d at 236, the Court will assume the latter, and will not ascribe significance to Imre's error.  The spelling used in Mr. Selmeczi's Affidavit will be used throughout this ruling.

In the summer of 1996, during my business trip to the U.S.A. I had visited my old-time friend Mr. Imre Papp and his family at their house in Franklin Park, N.J.

Mr. Papp was well known to me as a home builder/investor and as an owner of the well established and successful business, called Westerntrade LLC, registered in Hungary, engaged in imports and distributed building materials and other merchandise imported from U.S.A.

During our discussion I offered to loan him money – to invest – in order to build houses for sale for interest plus to share the profits.

On the very next day we found one suitable property, located at 8 Bayview Terrace, N.J.  [T]hen we decided and agreed to start with the project.

On or about September 25, 1996 I did wire $409,000.[] US-dollars of my own money from my bank account in Linz, Austria to Imre Papp's Unitrade Unlimited bank account in Elizabeth, N.J. [i]n order to invest as stated above.

Unfortunately up to this date I have not received any kind of payments on the abovementioned loan from Mr. Papp.

In addition to Mr. Selmeczi's Affidavit, the Papps submitted a one-page German-language document that appears to be a receipt for the $409,000 wire transfer.

The evidence that Mr. Selmeczi made a loan to the Papps is not sufficient to raise an issue of material fact necessitating a trial.  The Papps did not provide the Court with a written loan agreement or any other documentation relating to the negotiations between Mr. Selmeczi and Imre at the time the loan was made.  To the contrary, their only support is an Affidavit submitted 11 years after the supposed loan was made and a receipt showing that Mr. Selmeczi transferred money from a European account to one held by the Papps in the United States – the exact sort of transfer that Imre repeatedly utilized as part of the money laundering scheme in which he was engaged at the time of the supposed loan.  Moreover, the Papps did not produce records of any correspondence between themselves and Mr. Selmeczi during the 11-year period from the time the loan was made to the present.  Given Mr. Selmeczi's testimony that the Papps have not repaid any portion of the purported loan, such a lack of communication is exceedingly

strange.  If the wire transfer of $409,000 made on September 25, 1996 was actually a loan, Mr.

Selmeczi would undoubtedly have contacted the Papps to seek its repayment at some point over

the past decade.

The Papps' behavior with respect to the residence over the past 11 years further erodes

their contention that the $409,000 payment was a loan derived from legitimate sources.  Mr.

Selmeczi testified in his Affidavit that the loan was an investment meant to allow Imre to "build

houses for sale."  After the purported loan was made, however, Imre claims that he spent the

following two years personally constructing the residence at 8 Bayview Terrace.  That behavior

is wholly inconsistent with his claimed arrangement with Mr. Selmeczi, which would require

that he quickly complete and market the house in order to maximize their profits and the time-

value of the investment.  In fact, there is no evidence that the Papps ever sought to sell the home

at 8 Bayview Terrace.  To the contrary, after Imre personally designed and built the residence –

thus demonstrating a desire to customize the home that is out of keeping with the image of a

builder motivated by profit, who would view the property as a more fungible asset – the Papps

immediately moved into the house.  Maria Papp continues to reside there to this day.

It is well-established that a plaintiff may not survive a motion for summary judgment by

relying solely on unsupported factual assertions.  Anderson, 477 U.S. at 252.  To the contrary, a

"mere scintilla of evidence [is] insufficient; there must be evidence on which the jury could

reasonably find for the plaintiff."  Id.  The Papps have not produced such evidence to support

their contention that the $409,000 payment from Mr. Selmeczi was a loan.  To the contrary, the

only contemporaneous documentation that they have produced – the wire transfer receipt – fits

perfectly with the money laundering scheme in which Imre Papp and his brother were engaged at

the time, and would lead a reasonable juror to believe that the payment constituted the proceeds

of illegal activity.  Apart from that receipt, the only evidence weighing in favor of the Papps'

claims that the $409,000 payment was a loan are their unsupported factual statements and the

implausible after-the-fact Affidavit of Mr. Selmeczi.  Neither could lead a reasonable juror to

find that the residence was purchased with lawfully-obtained funds.  Therefore, the Court will

not credit the Papps' assertions relating the "loan" from Mr. Selmeczi.

Even if the Court were to accept as true the Papps' contention that Mr. Selmeczi loaned

them $409,000 for the purchase of the lot at 8 Bayview Terrace and construction of a residence

on that property, it would not necessarily mean that the house was not obtained using the

proceeds of illegal activity.  As discussed above, Imre Papp paid $175,000 for the property on

which the house is built, and spent a minimum of $373,114.02 on construction costs.[9]  Thus, the

total cost of the house was at least $538,112.02 – a price of $139,114.02 more than the alleged

loan.  The Papps contend that the remaining funds were derived from legitimate sources.

However, as laid out below, there is no evidence that the Papps accrued a sufficient amount of

legal income during the construction of the home to cover the $139,114.02 deficit with lawfully-

obtained funding.  In fact, there is strong reason – most significantly the fact that Imre Papp was

recorded by Swiss authorities telling his brother on May 28, 1998 that "[I]n order to be able to

finish the house, I need another 150 thousand" – to believe that a sizable portion of the money

spent building the house was derived from Imre's illegal activities.

### ii.    Tartsanyi Loan

Similarly, the Papps' claim that the construction of their residence was partially funded

using a $150,000 loan from Peter Tartsanyi does not defeat the Government's request for

summary judgment.  The Papps have submitted absolutely no documentation relating to that

alleged loan other than a copy of a check written from Imre to Mr. Tartsanyi, allegedly as

---

[9] The true cost was likely significantly greater.  <u>See</u> <u>supra</u> at n. 7.

payment for the balance of the loan.  Having already held that the affidavit submitted in support of their contentions relating to the payment from Mr. Selmeczi was insufficient to overcome the Government's proof that the residence was obtained using the proceeds of illegal activity, the Court now holds that the total lack of documentation supporting the Papps' claim that Mr. Tartsanyi also loaned them money is similarly deficient.  See Id. ("[A] scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").  Therefore, the Papps' unsupported factual assertions that they used a loan from Mr. Tartsanyi to help fund the purchase of their residence will be discounted.

In addition to being factually insufficient, the Papps' contentions relating to the alleged loan from Mr. Tartsanyi are not relevant to the question of whether their house was obtained using the proceeds of illegal activity.  Imre Papp claims that he repaid Mr. Tartsanyi with interest in 1999.  In support of that claim, he submitted a copy of a check dated March 10, 1999 made out to Mr. Tartsanyi from the Papps' Summit Bank account for $178,012.  The Papps claim that the funds used to pay the loan were obtained pursuant to a mortgage on their residence. However, as laid out above, the Summit Bank account used to pay off the loan was the recipient of 12 transfers of laundered money totaling $833,968 between January 1996 and October 1998. Thus, in claiming that the money used to pay the loan from Mr. Tartsanyi was derived from legitimate sources, the Papps engage in an unsupportable chain of circular logic – they claim that the loan was used to build the house, and that a mortgage on the house was used to pay the loan, all the while ignoring the fact that the bulk of the funds commingled in their Summit Bank account with the proceeds of both the loan and the mortgage were obtained illegally.  Having mixed their allegedly-legitimate funds with those obtained through Imre's unlawful activities, the

Papps may not escape forfeiture by making the disingenuous claim that the money drawn from the Summit Bank account in purchasing materials and labor for the construction of the residence and paying off the loan from Mr. Tartsanyi was completely derived from legitimate sources. Therefore, the Papps' claims relating to the alleged loan from Mr. Tartsanyi, even if credited, do not rebut the other evidence that their residence was purchased using the proceeds of illegal activity.

### iii.     Sale of Previous Residence

The Papps claim that they also derived legitimate income from the sale of their prior residence at 65 Central Avenue in Franklin Park, New Jersey.  That home was sold in 1999, after the Defendant residence at 8 Bayview Terrace was complete.  As such, the revenue derived from the sale could not have been used to fund the purchase of the 8 Bayview Terrace property, and cannot form the basis for a judgment that the Papps' current residence was not obtained using the proceeds of illegal activity.

According to the Papps, the $165,000 derived from the sale of their house at 65 Central Avenue was deposited in the Defendant Charles Schwab account.  The Government has not alleged that the house at 65 Central Avenue was obtained using the proceeds of illegal activity. Therefore, the funds derived from its sale would constitute legitimate income.[10]  However, the Papps have provided no documentation of that sale or the subsequent deposit of its proceeds into the Charles Schwab account.  Without such evidence – such as a copy of the sale contract and instrument used to make payment, along with bank records showing the deposit to the Charles

---

[10] In his Affidavit, Imre Papp states that a $50,000 mortgage on the property at 65 Central Avenue was paid using the proceeds of a mortgage obtained on the 8 Bayview Terrace residence. As discussed below, the Government has shown probable cause to believe that the latter residence was obtained using the proceeds of illegal activity, and any mortgage on the property would therefore also constitute such proceeds.  Thus, at least $50,000 of the $165,000 derived from the sale of the 65 Central Avenue residence is subject to forfeiture.

Schwab account – the Court is left with nothing but the Papps' unsupported factual assertions that the Charles Schwab account contains legitimate income rather than the proceeds of money laundering.  As discussed above, such assertions, without more, are insufficient to raise an issue of material fact precluding summary judgment.  Id.  Thus, the Papps' allegations that the contents of the Charles Schwab account represent legitimate income derived from the sale of their prior residence have failed to meet their burden of proof, and those allegations must be disregarded.  Id.

### iv.    Mortgage on 8 Bayview Terrace Residence

As a fourth ground for contesting the Government's evidence, the Papps claim that the contents of the Defendant bank accounts were derived in part from legitimate income obtained through a March 3, 1999 mortgage on their residence at 8 Bayview Terrace.  Pursuant to that mortgage, they received a lump-sum cash payment of $321,141.97.  Obviously, the mortgage was obtained after the residence itself was acquired, and therefore has no bearing on the question of whether the house at 8 Bayview Terrace was purchased using illegally-obtained funds.

Nor does the mortgage affect the Court's determination of whether the Defendant bank accounts constitute the proceeds of illegal activity.  If the residence was purchased with such proceeds, any payment pursuant to a mortgage on the house would also be derived from illegal activity.  Therefore, the Papps may not use the funds derived from the mortgage on the 8 Bayview Terrace residence to rebut the Government's evidence that the Defendant bank accounts are subject to forfeiture.

### v.    Legitimate Business Income

Additionally, the Papps claim that an unspecified amount of legitimate income derived from an import/export business operated by Imre and his brother Endre contributed to the funds

used to obtain the Defendant property.  In support of that contention, Imre Papp submitted several bills of lading that he contends demonstrate that he ran a profitable business shipping building materials and other goods to customers in Europe during the period that the Government contends he and his brother were engaged in the criminal scheme to defraud Seeland Bank and conceal the proceeds of their activities through money laundering.  In fact, Imre goes so far as to assert in his Affidavit that none of the money transferred to his accounts in the United States or personally imported during his travels was derived from illegal activity.  (Imre Papp Aff. ¶ 14.) Rather, he claims those funds represented "commissions" from the import/export business, and were wholly legitimate.  (Id.)  That claim is remarkable given the Court of Cassation's findings and his conviction for money laundering based on the same transfers, and will not be credited by this Court.

Beyond his demonstrably false assertion that the wire transfers for which he was convicted of money laundering constituted "legitimate" income, Imre has not submitted any evidence of funds derived from the import/export business he allegedly ran.  The bills of lading attached to his Affidavit give no indication as to whether the business was profitable, much less whether it resulted in income sufficient to allow the Papps to obtain the Defendant property. Given the total lack of such evidence, along with the massive amount of documentation to the opposite effect submitted by the Government, the Court will disregard the Papps claims that the Defendant property was acquired using the proceeds of a lawful import/export business.  See Anderson, 477 U.S. at 252 ("[A] scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

### v.      Maria Papp's Wages

Finally, the Papps note that Maria – who was not charged with involvement in her husband's scheme – derived income from her employment that could have been used to obtain the Defendant property.  During the period between the beginning of Imre and Endre Papp's criminal activities and January 1998, she was employed full-time and compensated at a rate of $50,000 per year.  She contends that the entirety of her wages were deposited in the Summit Bank account each year.  In January 1998, Maria's employment was terminated.  At that time, she received an $18,000 severance payment, which she claims was also deposited in the Summit Bank account.  Additionally, Maria claims that she had accrued $57,000 in a 401(k) retirement account at the time of her termination.  She allegedly deposited those funds in the Charles Schwab account.

While unemployed following her termination in 1998, Maria asserts that she received $400 per week in unemployment insurance benefits for a period of six months.  As with her prior wages, she claims that the entire amount of those benefits was deposited in the Summit Bank account.  Thereafter, Maria claims to have returned to work at a rate of $60,000 a year.  She has provided no evidence of whether she returned to work prior to the time the Defendant accounts were frozen on March 27, 2000 or what portion, if any, of her wages was deposited in the Defendant accounts.

Maria does claim, however, that she deposited roughly $13,894 of legally-obtained funds in the Summit Bank account between Imre's arrest and the time it was frozen.  Specifically, she avers that the Summit Bank account "held less than $2,000 at the time of my husband's arrest on August 25, 1999.  About seven months later, on March 27, 2000, at the time when the accounts

were frozen by these proceedings, the Summit Bank account held the amount of $15,894." (Maria Papp Aff. ¶ 12.)

In assessing Maria's claims that she funded the Defendant accounts with legitimate income, the Court first notes that she has provided no evidence – such as deposit records – that would verify her testimony.  Her assertion that she deposited the entire amount of her yearly wages in the Summit Bank account during the period she was employed prior to January 1998 is absurd.  Her yearly gross pay of $50,000 would have been significantly reduced by income and payroll taxes.  Without any evidence relating to what portion of the remaining funds, if any, was deposited into each of the Defendants accounts, there is no basis other than the Papps' assertions for finding that the contents of the Defendant accounts were derived from Maria's wages rather than Imre's illegal activities.  Such unsupported factual allegations to not meet the burden of proof necessary to survive a motion for summary judgment.  <u>Anderson</u>, 477 U.S. at 252 (stating that the non-moving party must advance at least some evidence on which a jury could reasonably find for in their favor in order to overcome such a motion).  Therefore, the Court will disregard the Papps' claim that the Defendant accounts were funded using Maria's wages.

In addition to lacking any evidentiary support, the Papps' contention that Maria saved the entire amount of her wages is a disingenuous attempt to segregate those legitimately-obtained funds from the proceeds of Imre's illegal activities, both of which were commingled in the Defendant's accounts.  The Government has demonstrated that the Papps spent large sums on the construction of their residence at 8 Bayview Terrace during the period that Maria claims she was saving the full amount of her wages, and no reasonable juror could find that they did not spend at least some portion of their income on necessities such as food, clothing, and transportation.  Those facts being established, the Papps may not escape forfeiture by claiming that the money

spent – much of which can no longer be recovered – was comprised solely of funds derived from illegal activity, while the money saved in the Defendant accounts was obtained legitimately. Such contentions are as ineffective and unbelievable as an attempt to draw a line in the ocean and claim that the water on one side is separate from that on the other.  Like the water, the funds flowing through the Papps' accounts were inseparable and fluid, and any attempt to segregate the illegitimate elements from those lawfully obtained is simply a transparent attempt to escape forfeiture.

The Papps' allegations that the amount in the Summit Bank account increased by roughly $13,894 between Imre's arrest and the time the account was frozen are less easily dismissed.  As discussed above, Imre Papp was arrested on August 25, 1999.  The Defendant accounts were not frozen until the day before the Government filed its Complaint in this action on March 28, 2000. Since Imre was incarcerated (he was held by Federal Marshals until being extradited to Switzerland in January 2000), it is undisputed that he could not have continued to engage in criminal activity during that time period.  Thus, any increase in the balance of the account must have been derived from Maria Papp's income, which was lawfully-obtained as part of her employment.

The Government has not presented any documentation negating Maria Papp's claim that the increase in the Summit Bank account balance between Imre's arrest and the time the account was frozen was attributable to her wages.  Thus, the only evidence before the Court is Maria Papp's testimony to that effect.  Although she has submitted no documentation to back up that claim, the Court finds that a material dispute of fact exists on the narrow issue of whether the alleged increase of approximately $13,894 in the Summit Bank account balance between August 25, 1999 and March 27, 2000 was derived from legitimately-obtained funds.  That issue can

easily be resolved: the Papps must simply produce records demonstrating that the deposits during

that period came from Maria's wages.  If that is the case, the $13,894 will not be subject to

forfeiture.  As discussed above, however, the Government has shown probable cause that the

funds contained in the account at the time Imre was arrested were derived from illegal activity,

and the Papps have not rebutted that showing by a preponderance of the evidence.  Therefore,

any funds contained in the account at the time of Imre's arrest will be subject to forfeiture

pursuant to 18 U.S.C. § 981.

## E.  "Innocent Owner" Defense

Even if the Court finds that the Defendant residence at 8 Bayview Terrace was obtained

using the proceeds of illegal activity, the Papps contend that Maria's interest in the property

should not be forfeited because she is an "innocent owner" within the meaning of 18 U.S.C.

§ 983(d).  That statute states, in relevant part, that "[a]n innocent owner's interest in property

shall not be forfeited under any civil forfeiture statute.  The claimant shall have the burden of

proving that the claimant is an innocent owner by a preponderance of the evidence."  18 U.S.C.

§ 983(d)(1).  The statute defines "innocent owner" to mean an individual who "(i) did not know

of the conduct giving rise to forfeiture; or (ii) upon learning of the conduct giving rise to

forfeiture, did all that reasonably could be expected under the circumstances to terminate such

use of the property."  18 U.S.C. § 983(d)(2)(A).  It then lends further definition to the term "all

that reasonably could be expected," by stating that, in order to fall into that category, the

claimant must demonstrate that he or she:

> [G]ave timely notice to an appropriate law enforcement agency of information
> that led the person to know the conduct giving rise to a forfeiture would occur or
> has occurred; and in a timely fashion revoked or made a good faith attempt to
> revoke permission for those engaging in such conduct to use the property or took
> reasonable actions in consultation with a law enforcement agency to discourage or
> prevent the illegal use of the property.

18 U.S.C. § 983(d)(2)(B)(i).

The statute adds a caveat to that requirement by stating that "[a] person is not required by this subparagraph to take steps that the person reasonably believes would be likely to subject any person (other than the person whose conduct gave rise to the forfeiture) to physical danger."  18 U.S.C. § 983(d)(2)(B)(ii).

Under the standard outlined by the statute, in order to avail herself of an innocent owner defense Maria must demonstrate by a preponderance of the evidence that she either (1) did not know of Imre's criminal activity or (2) gave timely notice to law enforcement upon learning of the money laundering scheme.  She has submitted no evidence that she falls into either of those categories.[11]  Therefore, no reasonably juror could find that Maria Papp has established by a preponderance of the evidence that she is an innocent owner, and the Court will grant summary judgment ordering forfeiture of her interest in the residence at 8 Bayview Terrace.  See Anderson, 477 U.S. at 252.

### III.  CONCLUSION

For the foregoing reasons, the Government's Motion for Summary judgment is granted in part, and the Papps' claims to the Defendant property other than the Summit Bank account are dismissed.  The Defendant property comprised of (1) the residence and lot located at 8 Bayview Terrace in Greenbrook, New Jersey, and (2) the contents of (i) the Charles Schwab account and (ii) the Independence Community Bank Account is forfeited pursuant to 18 U.S.C. § 981.

---

[11] Given the large amount of income the Papps derived from Imre's criminal activities, it is highly unlikely that Maria was unaware that he and his brother were involved in the scheme.  If she did know, there is no evidence that she took steps to alert authorities.  In fact, the circumstances of Imre's arrest – which came only after a two-year international investigation by Swiss and United States law enforcement – weigh in favor of the opposite conclusion.

The Papps claims to the Summit Bank account are sustained.  The parties are instructed to submit within 30 days of this ruling supplemental evidence relating to whether Maria Papp deposited lawfully-obtained funds in that account between Imre's arrest on August 25, 1999 and the time the account was frozen on March 27, 2000.  After receiving that evidence, the Court will issue a supplemental Order relating to the Government's Motion for Summary Judgment on the Papps' claims to the Summit Bank account.

　_s/ Dickinson R. Debevoise_____
　DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: October 5, 2009